Reverend P. L. PERKINS, Phillips County Concerned Citizens, Sam Bennett, John Hamilton, Mrs. Lillie Mae Stevenson, Wilson Rodgers, Reverend Julius McGruder, Welton Davis, Reverend C. W. Gilcreast and Orta Bush, Plaintiffs,

v.

CITY OF WEST HELENA, ARKANSAS, Mayor Jesse Porter, City Councilmen, Bob Teeter, Dick Cunningham, Tommie Dial, Charles Miles and Dwight Galloway, Defendants.

No. H C 78 44.

United States District Court,
E. D. Arkansas, E. D.

April 10, 1981.

P. A. Hollingsworth, Perlesta A. Hollingsworth, P. A., Little Rock, Ark., for plaintiffs.

Ralph C. Murray, City Atty., West Helena, Ark., for defendants.

## OPINION AND ORDER

OVERTON, District Judge.

This is a class action suit pursuant to 42 U.S.C. § 1983 in which the plaintiffs[1] seek

---

1. Although this case was filed as a class action claim, no motion for class certification was filed nor was there any action taken on the class allegations. Reverend P. L. Perkins, Sam Bennett, John Hamilton, Reverend Julius McGruder and Welton Davis are not residents of the City of West Helena and have not demonstrated any basis for concluding they are proper parties to the lawsuit. The legal status of the "Phillips County Concerned Citizens" is unclear. The Court concludes that Mrs. Lillie Mae Stevenson, Wilson Rodgers, Reverend C.

to represent all black registered voters of the City of West Helena. It is contended that the city's election procedure which requires election of city council members on an "at large" basis violates the Fourteenth and Fifteenth Amendment rights of the class. In addition to a declaration that the current election procedure is unconstitutional, plaintiffs ask that the Court compel the implementation of elections by single member districts to insure constitutionally fair representation in city government.

Plaintiffs amended their complaint to further allege that the City of West Helena engaged in a practice of denying blacks an opportunity to fully exercise their right to vote in violation of Section 2 of the Voting Rights Act, 42 U.S.C. § 1973. Additionally, plaintiffs contend that the population in the four city wards is not "substantially equal" as required by Ark.Stat.Ann. § 19–1002.7 and alleged the Court has pendent jurisdiction to direct the correction of the inequality.

The State of Arkansas intervened for the purpose of defending the facial constitutionality of Ark.Stat.Ann. § 19–1002 et seq., the statutes which authorize the election procedure employed by the City of West Helena.

The Court has jurisdiction of the case by reason of 28 U.S.C. § 2201 and 28 U.S.C. § 1343(3).

The parties entered into the following pre-trial stipulation which is incorporated as part of these findings and conclusions:

1. The City of West Helena, Arkansas, is classified as a city of the first class under the laws of the State of Arkansas.

2. The City of West Helena, Arkansas, was incorporated on May 23, 1917.

3. The City of West Helena, Arkansas, became a city of the first class on January 15, 1920.

4. The City of West Helena, Arkansas, was divided into four (4) wards with the boundary lines separating the four (4) wards remaining the same since becoming a city of the first class in 1920.

W. Gilcreast and Orta Bush are proper parties plaintiff and that there is no need to reach any

5. The present at-large method of electing aldermen for the City of West Helena, Arkansas, has been the same since the City of West Helena, Arkansas, became a city of the first class in 1920.

6. The method of electing aldermen for the City of West Helena, Arkansas, is one of the methods permitted by Ark.Stat.Ann. §§ 19–1002.5 and 19–1002.7. (Repl.1980). This statute provides for a total of eight (8) aldermen with two (2) being elected from each ward.

7. That pursuant to Ark.Stat.Ann. § 19–1002.7 (Repl.1980), candidates for the office of alderman shall reside in the ward from which they seek to be elected and, under the chosen method, shall run at large.

8. That at the time of filing this cause of action there were eight (8) elected aldermen in the City of West Helena, Arkansas, with six (6) of those so elected being white and two (2) of those so elected being black. These were:

Ward 1: Bob Teeter—white
Ernest Simpson—black
Ward 2: Dwight Galloway—white
Vernon Joyner—white
Ward 3: Thomas L. Dial—white
Charles Miles—white
Ward 4: J. R. Cunningham—white
L. T. Simes—black

9. That at this time there are eight (8) aldermen in the City of West Helena, Arkansas, and that those eight (8) are as follows:

Ward 1: Watson Light—white
Ernest Simpson—black
Ward 2: Walter Morris—white
Dwight Galloway—white
Ward 3: Durwood Montgomery—white
Bruce King—white
Ward 4: Harold Smith—white
E. F. Kalb, Jr.—white

10. That the mayor in and for the City of West Helena, Arkansas, at this time is R. E. "Bob" Teeter.

11. That voter registration records do not reflect race.

additional conclusion with respect to the status of the parties.

12. All registered voters residing in West Helena, Arkansas, can vote for the candidate of their choice from those so electing to be a candidate for a municipal office.

13. At the time of the filing of this cause of action, P. L. Perkins, Sam Bennett, John Hamilton, Julius McGruder and Welton Davis were not residents of the City of West Helena, Arkansas.

14. That at the time of the filing of this cause of action, there was in effect in the State of Arkansas Ark.Stat.Ann. § 19–1002.5 (Repl.1980), which provides:

"On the Tuesday following the first Monday in November, 1966, and every two (2) years thereafter the qualified voters of all cities of [the] first class with less than fifty thousand (50,000) inhabitants having the Mayor-Council form of government shall elect two (2) Aldermen from each ward for a term of two (2) years. The election officials shall designate the Aldermen as Alderman No. One (1) and Alderman No. Two (2)."

15. That at the time of the filing of this cause of action, there was in effect in the State of Arkansas Ark.Stat.Ann. § 19–1002.7 (Repl.1980), which provides:

"Candidates for the office of Alderman in cities of the first class shall reside in the ward from which they seek to be elected, and shall run at large, and all of the qualified electors of such cities shall be entitled to vote in such election.

Provision shall be made by the election commissioners in any such cities so that the qualified electors of each ward shall have at least one (1) voting precinct in each ward where the resident electors thereof may cast their ballot.

Provided, however, that the city council of any city is empowered and authorized to provide by ordinance that all aldermen be elected by ward, in which event each alderman shall be voted upon by the qualified electors of the ward from which such person is a candidate, and when so provided by city ordinance the name of such candidate shall appear upon the ballot only in the ward in which he is a candidate. Provided, further, that all such cities choosing to elect aldermen by ward shall provide, in the manner provided by law, for the establishment of wards of substantially equal population in order that each alderman, or aldermen, elected from each ward shall represent substantially the same number of people in the city."

16. Plaintiffs, Lillie Mae Stevenson, Wilson Rodgers, and Orta Bush, are black citizens of the United States, residents of Phillips County.

17. Since the city was incorporated, there have only been three black city councilmen.

18. In 1978, three black candidates ran for city council, no black candidate was successful.

19. The 1970 census estimates that the total population of West Helena is 11,005. Of this total 59.6% (6,564) are white and 40.4% (4,441) are black.

20. In the State of Arkansas Negroes were first allowed to vote by Article 1 § 3 of the Constitution of 1868.

21. That a poll tax was assessed as a requirement for voting in Arkansas until 1965, and was repealed by Amendment 51 § 17 of the Arkansas Constitution.

22. In 1970 the first private non-parochial school in the City of West Helena was formed.

23. The State of Arkansas has no legislative policy which prefers at-large elections.

### Background

Arkansas and the City of West Helena, by implementation of Arkansas election laws, have a long history of racial discrimination in the election process.[2]

2. Plaintiffs' exhibits 30, 31, 32, 33 and 34 provide some examples evidencing this historical fact. Plaintiffs' exhibit 38, which is received in evidence over defendants' objections, accurately reflects the methods of disenfranchisement employed over the years.

The passage of the Voting Rights Act in 1965 and the abolition of the poll tax that same year removed the last of the legal impediments to blacks voting in Arkansas.

The City of West Helena is divided into 4 wards. The eastern boundary of the city borders the corporate limits of the City of Helena. The principal portion of West Helena's growth has necessarily been to the west with lesser growth to the north and south. The city's existing ward lines were drawn when the current system of municipal government was adopted in 1920. They have never been changed. Because residential housing is essentially segregated, the voters in Wards 2 and 3, which are the two easternmost wards, are almost all white voters. The portions of Wards 1 and 4 (1A, 4A, 4A3 and 4C) which are contiguous to Wards 2 and 3 are predominantly white. Wards 1B and 4B are an identifiable black residential area separated from the other wards by a railroad siding track and the voters are almost exclusively black.

Since the ward lines have not changed since 1920 and the growth has been to the west, a significant disparity has developed in the population in each ward. The 1970 census comparative population figures are shown in the following chart:[3]

| Ward | Population | % of Total |
|------|-----------|-----------|
| 1 | 3,765 | 35% |
| 2 | 1,011 | 9% |
| 3 | 2,103 | 18% |
| 4 | 4,214 | 38% |

Although by national standards neither the white nor black residents of West Helena fare well with respect to years of education, employment, income and housing, there exists a significant disparity between blacks and whites. On average, the whites have significantly more years of formal education, less unemployment, more income and better housing.[4]

Between 1966 and 1978, blacks have been candidates for city alderman on 12 occasions. Any registered voter may become a candidate for alderman by getting 10 signatures on a petition. (Testimony of Lillie Mae Stevenson.) DeWitt Jordan, a black, ran in 1968, 1970 and 1972. He was apparently elected on one occasion, but the evidence is not clear when he was elected or if he was defeated for re-election. In 1976, 2 blacks were elected to the City Council. In each instance when a black was elected, he ran against two whites and was elected by a plurality of the vote. When the blacks stood for re-election, only one white ran against each black incumbent and each black was defeated. Almost without exception, the black candidates have gotten in excess of 90% of the vote in the wards which are identifiable "black voting areas" and between 15% and 24% of the votes in the identifiable "white voting areas".[5]

Blacks can campaign in predominately white areas of the city although it is difficult for black candidates to reach white voters. (Testimony of Lillie Mae Stevenson and Ernest Simpson, Jr.) By the same token, whites campaign in black voting areas but without success when running against a black candidate. (Testimony of Watson Light.) The difficulty is not the result of any policy or practice of the City of West Helena or any organized civic group.[6]

For the last few years, blacks have actively participated in the election process in West Helena. Blacks have engaged in voter registration drives with some success although such factors as illiteracy, feelings of inferiority by some because of their occupations, apprehension on the part of welfare

---

**3.** See also, plaintiffs' exhibits 3 and 3A.

**4.** See generally plaintiffs' exhibit 5 at page 16 and plaintiffs' exhibit 8.

**5.** For the specific results see plaintiffs' exhibit 1. The Court concludes that plaintiffs' characterization of black voting areas and non-black voting areas as reflected on exhibit 1 are generally accurate.

**6.** Plaintiffs contend the all white West Helena Promotional Association, a group of business and civic leaders, is an organization which promotes white candidates for City Council to the exclusion of black candidates. The evidence is not persuasive that the Association engages in any formal or concerted political activity.

recipients about the possible consequences of their active participation in the election process and an attitude that their vote will not be significant has kept some blacks from registering and voting. The County Election Commission has sent voter registration people to the black community in an effort to register blacks. (Testimony of Lillie Mae Stevenson and Georgia Thornton.)

Blacks serve as election judges at polling places in both black and white voting areas. Candidates, under Arkansas law, are given the right to select "poll watchers" at all polling places so black candidates can select representatives who are authorized to monitor the voting process.

Polling places in some of the black voting areas are not ideal and may discourage some voters. These places are, however, selected by the Phillips County Election Commission and not the City of West Helena. Furthermore, the polling places are usually chosen on the basis of what building is available within the precinct and not the result of deliberate choice on the part of the Commission. (Testimony of Lillie Mae Stevenson and Georgia Thornton.)

The black vote in West Helena is significant and is sought after by candidates. (Testimony by several witnesses.)

Historically, blacks have had no representation or have been under-represented on city commissions and as employees of the police, fire and water departments.[7]

Blacks have long felt that city government in West Helena was unresponsive to their needs. Their concerns have principally centered around their belief that police brutality was directed toward blacks, lack of street paving and inadequate drainage in black residential areas, inadequate and poorly maintained park facilities, lack of representation or under-representation on the City Council and city commissions, failure to provide sewer and water service to some black residential areas and city expenditures for such things as golf courses at times essential services were denied black residential areas.

The black community has used several methods to present their grievances. In 1969, following an incident when a black died while in custody of the city police, the black community instituted a boycott of white businesses. As previously mentioned, voter registration drives were initiated and blacks sought positions on the City Council. Blacks regularly attend City Council meetings and present grievances. In 1978, another boycott of white businesses was conducted. Lawsuits involving police brutality and public housing assignments have been pursued. Particularly pertinent to this case is the fact that petitions seeking a change in the method of electing aldermen have been presented to and acted upon by the City Council.

Those efforts described have, over the years, produced varying degrees of responsiveness from the City of West Helena.

*Identifiable Problem Areas*

1. Recreation Facilities

A five member City Park Commission created in 1965 supervises the operation of municipal recreational facilities. At least two blacks, Charles Mills and Marcus Wiley, have served on the Commission.

There are two city parks owned and operated by the City of West Helena. One park is located in the eastern section of town and is used exclusively by whites. It was developed first. The West Helena Junior Auxiliary and the Jaycees furnish the playground equipment at the park. An all white baseball league uses the baseball facilities at the park. All of the improvements in connection with the baseball park have been made by the volunteer baseball association which leases the baseball facility from the city. Two CETA workers assigned by Phillips County have worked at the park at times although it is difficult to determine from the evidence the nature and extent of their involvement in park maintenance and, in particular, the construction or maintenance of the baseball facility. The CETA workers

7. Plaintiffs' exhibit 39, responses to interrogatories.

are supervised by the Superintendent of the all white Twin City Baseball League which permits an inference that a significant amount of their time is probably spent working on the baseball facilities for the all white baseball league. The park in the eastern section which could be described as the "white park" is well maintained and accessible. At least some of the maintenance is provided by volunteers.

The other park, which is located in the western section of the city and may be described as the "black park" since it is used only by the black community, is inaccessible, poorly located and poorly maintained.[8]

As a result of the 1978 boycott, the "black park" was cleaned up. (Testimony of Lillie Mae Stevenson.) A lighted baseball field was constructed by the City Park Commission. Because of poor location, it is difficult to police the park and vandals have stolen the copper wire from the electrical lighting system, and shot out the lights. Basketball goals have been erected five or six times but they have been stolen. No significant volunteer work is done on the "black park". (Testimony of William Waddell.)

The Park Commission is investigating the possibility of relocating the "black park" so that it is more accessible and easier to police.

Expenditures for the two parks by the city for the three years (1976, 1977 and 1978) preceding the filing of this suit were as follows:

East (white) Park    $11,807.00

West (black) Park    $12,800.00    [9]

The city owns and operates tennis courts which are located in the white residential area. The property was donated by a civic organization and the courts were constructed with grant funds. Blacks as well as whites use the tennis courts.

The Park Commission also developed and supervises a golf course which is located outside the city limits on airport property. The Commission members, with the help of the National Guard engineers, built the course and a golf professional has been hired to maintain the course. Some blacks use the golf course.

2.  Public Housing

The Housing Authority of the city of West Helena administered the operation of the low income public housing projects in the city. The Housing Authority has five members, one of whom is black and was appointed in 1975. In 1979, the Housing Authority, in response to a suit by the United States in behalf of blacks allegedly discriminated against by the Authority in public housing assignments, agreed to a consent decree designed to eliminate discriminatory practices.[10]

The school system in West Helena has been desegregated since 1970.[11]

3.  Police Brutality

In 1969, the killing of a black inmate at the City Jail resulted in a boycott of white businesses. Blacks contend that over the years they have been subjected to harassment and brutality at the hands of the West Helena Police Department. Civil litigation by individual blacks has resulted in settlement of claims against city policemen. (Testimony of L. T. Simes.) The police and fire departments are subject to the supervision of the Civil Service Commission which has five members.[12] One black serves on the Commission but he has not effectively voiced the grievances of blacks. As of 1965,

8.  Plaintiffs' exhibits 12, 13, 17, 21 and 26. Also, testimony of Bankston Waters and Lillie Mae Stevenson.

9.  Defendants' exhibit # 5.

10.  Plaintiffs' exhibit # 39 (Response to Interrogatory # 19) and plaintiffs' exhibit # 28.

11.  Testimony of Bankston Waters.

12.  Plaintiffs' exhibit # 39 (Response to Interrogatory # 19)

no blacks were employed on the city police force. In 1970, four blacks were employed on a force of nineteen. In 1975, there were nine black employees in a department of thirty-three. In September, 1979, the police department had thirty-five employees as follows: [13]

### Employees By Race and Sex

```
White males    -  24
White females  -   1
Black males    -   9
Black females  -   1
```

### Employees By Position

```
 1 police chief -   white
 2 captains     -   1 white, 1 black
 1 lieutenant   -   black
 4 sergeants    -   white
14 patrolmen    -   12 white, 2 black
 1 C I D agent  -   white
 9 auxiliary
   patrolmen    -   5 white, 4 black
 1 radio
   operator     -   white female
 1 typist       -   black female
 1 janitor      -   black
```

There was no specific evidence of instances of alleged police brutality since 1977. There is no basis in the evidence for the conclusion that the city currently condones police brutality directed toward blacks.

### 4. Streets and Delivery of City Services

The condition of the streets in the black residential areas has been one of the principal sources of complaint by the black community. In 1952 no streets were paved in the black areas and very few were paved in the white community. (Testimony of Jesse Porter.) Prior to the early 1970's, many of the streets in the black wards remained unpaved, drainage was poor, the ditches were not maintained and holes or cuts made by utility companies were not repaired. Delegations of blacks appeared before the City Council complaining about the condition of the streets. The two black City Council members who were serving on the Council in 1977 and 1978 urged the Council to improve the quality of street paving in the black areas. (Testimony of L. T. Simes

and Ernest Simpson, Jr.) Photographs taken in 1977 demonstrate some of the problems which brought about the complaints.[14]

The city initiated a program of street improvement but the quality of the work was not satisfactory. Since 1972, substantially more money has been spent in the predominately black wards (1 and 4) than in the predominately white wards (2 and 3).

The total expenditures per ward from 1972 through 1979 were: [15]

```
Ward 1          $243,676.53
Ward 2             5,684.00
Ward 3            36,448.25
Ward 4           155,646.29
```

More expenditures were necessary in the black residential areas because streets "were so bad to start". (Testimony of Lillie Mae Stevenson.)

Two hundred fifty thousand dollars of the listed expenditures were from an Economic Development Administration grant given for improvement of "blighted areas". Most of the grant spent on streets was spent for street paving in the black residential areas.

Although no specific figures are available from the evidence, the Court has the impression that a substantial portion of the expenditures for capital improvements in the black residential areas has been money from federal grant funds. The City has not qualified for some grant funds because it did not have an affirmative action plan which met the standards required by H.U.D.[16] An affirmative action plan for the city was not adopted until June, 1980.

In 1978, when Jesse Porter left office as Mayor, all streets in the city had some type of paving.

Apparently the city does not build curbs, gutters or sidewalks. Curbs, gutters and sidewalks are built by improvement districts or, in the case of new residential

---

13. Plaintiffs' exhibit # 39 (Response to Interrogatories # 5 and # 6).

14. See plaintiffs' exhibits 9, 10, 19, 20, 23 and 28.

15. See defendants' exhibit # 5.

16. See plaintiffs' exhibit # 27.

developments, by the subdivision developers.

Drainage is a problem in black residential areas, but the problem also exists to some extent in all portions of the city.

The Fire Department has one station located in the "middle" of town in Ward 4 and adjacent to Ward 1. The department did not have a black employee until 1978. In September, 1979, there were 14 employees in the department and two were black. The plaintiffs cited one instance when the department failed to respond to a call at a black residence, but the residence was outside the city limits.

Presumably the department adequately services all areas of the city.

Other specific instances of complaints from blacks about delivery of city services to which the Council has not responded are the failure of the city to demolish some burned or unsightly vacant buildings in the black business area, providing police escorts for white funeral directors and not black funerals, and failure to operate the street sweeper machine in the area of black owned businesses. These matters were called to the Council's attention when Mr. L. T. Simes, a black, was serving as a member of the Council. Apparently the Council took no action on either complaint.

5.  Representation on Boards and Commissions and Employment of Blacks in City Departments.

The responses to interrogatories introduced as plaintiffs' exhibit # 39 are accepted as factual with respect to appointment to City Boards and Commissions, racial composition of employees in various city departments and applicants (by race) for certain city jobs.

The information contained in the responses generally reflects that in the 1960's blacks were excluded from almost all boards and commissions; that blacks were not employed (nor did they apply) as policemen or firemen; and no black held any position with the city other than menial jobs. Beginning in the early 1970's some blacks were appointed to commissions and blacks were employed in other than menial jobs. Although the figures on appointments and employment reflect improvement, particularly since about 1975, blacks continue to be under-represented in proportion to their population in appointive positions on commissions and employment in a number of departments.[17]

Currently, the situation presents a picture of sharp contrast. The water department has no blacks employed in jobs other than as laborers and the department is supervised by an all white commission. On the other hand, the Mayor's Advisory Council, which has 15 members of relatively recent appointment, is chaired by a black male and is composed of four black males, five black females, three white males and three white females.[18]

When two vacancies occurred on the City Council in 1980, a black former council member, Ernest Simpson, was appointed to one position. Another black, L. R. Franklin, was nominated and elected by the Council to fill the other position but he declined the appointment. A white was subsequently appointed to fill the position Franklin declined. (Testimony of Watson Light and Ernest Simpson.)

6.  Public Access to City Council and Election By Ward

The City Council has a policy of conducting "open" Council meetings and any person who desires to present a grievance or request Council action may do so by attending Council meetings. (Testimony of Bob Teeter and Georgia Thornton.)

---

17.  There is no evidence by which a representative comparison can be made other than the general 60% white to 40% black general population ratio. Given the information regarding education and employment in plaintiffs' exhibit # 5, this may not be a satisfactory comparison.

18.  Defendants' exhibit # 6.

Blacks have been heard by the Council on any number of occasions[19] and there is no evidence that any black or group of blacks has been denied the right to present problems before the Council. The Council has frequently failed to act favorably upon requests by blacks[20] but in every instance cited, the grievance or request was acknowledged and discussed. (Testimony of William Waddell and Julia Adkins.)

A pertinent petition by blacks, insofar as this suit is concerned, has been the request for a change in election procedure in order to elect Council members by ward. Aside from official petitions, the Council members are aware that blacks desire ward elections. (Testimony of Watson Light.)

The only occasion when the matter of election by wards was officially acted upon by the City Council occurred in the fall of 1977. At the November 29, 1977, meeting, the Council voted four to three to draft an ordinance which would prescribe election by ward for presentation at the next Council meeting.[21] Thereafter the City Attorney expressed the opinion that under Arkansas law the adoption of a municipal ordinance, resolution or order required a majority vote of all elected members of the Council.

At trial some of the present Council members expressed reasons they were opposed to election by ward. Watson Light, a white alderman who resides in Ward 1, testified that he did not want election by ward because black voters predominated in his ward and he could not be elected. He said that blacks in his ward voted "in bloc" and outnumbered the whites. He also testified that city wide the whites outnumber

blacks and, because of whites voting "in bloc", a single black candidate could not be elected. Mayor Bob Teeter is opposed to election by ward because of the "local" nature of the alderman's interest as opposed to the "city wide" interest which must be maintained by alderman subject to city wide vote.[22]

Although as previously noted, the wards are not "substantially equal" in population, there apparently has been no petition presented to the Circuit Court of Phillips County requesting that the ward lines be changed to correct the inequality.[23]

## Legal Background

Claims of denial of the right to suffrage have provided a fertile field for litigation since the Supreme Court's historic decision in *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). In *Baker*, the Court held that a claim "under the Equal Protection Clause challenging the constitutionality of a State's apportionment of seats in its legislature, on the ground that the right to vote of certain citizens was effectively impaired since debased and diluted, in effect presented a justiciable controversy subject to adjudication by federal courts." *Reynolds v. Sims*, 377 U.S. 533, 566, 84 S.Ct. 1362, 1384, 12 L.Ed.2d 506 (1964). The theory underlying *Baker* and *Reynolds* is that a citizen's right to vote can be denied by debasement or dilution of the weight of the citizen's vote just as effectively as by a flat prohibition of free exercise of the franchise. *Reynolds, supra,* 377 U.S. at 555, 84 S.Ct. at 1378.

19. Plaintiffs' exhibit # 39, answer to interrogatory # 20, and plaintiffs' exhibits 35, 36, 37 and 40.

20. See testimony of L. T. Simes in which he reviewed Council minutes from February 5, 1977, through September 5, 1977 (period preceding boycott) regarding presentation of problems which failed to produce favorable Council action.

21. Plaintiffs' exhibit # 37.

22. The same opinion was expressed by Jessie Porter, Mayor in 1977 when the resolution regarding election by ward was presented. Al-

dermen Joyner and Teeter, who voted against the resolution in 1977, wanted to submit the issue to the electorate. Alderman Cunningham, the other dissenting voter, expressed the opinion that, "I do not think you would have fair representation as far as white people are concerned with the four wards." (Plaintiffs' exhibit # 37)

23. The procedure for changing ward boundaries to correct population disparities as provided by Arkansas law is discussed *infra* at p. 25.

It has, however, been held that multi-member districts in a legislative apportionment scheme are not unconstitutional *per se. Fortson v. Dorsey*, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965). It was, however, recognized that, under the circumstances of a particular case, a multi-member constituency scheme might operate to minimize or cancel out the voting strength of a discreet and insular political minority. *Id.* at 439, 85 S.Ct. at 501.

Claims quite similar to the case at bar were recently the subject of litigation before Chief Judge Eisele of this Court. His thorough and scholarly Memorandum Opinion in *Leadership Roundtable v. City of Little Rock*, 499 F.Supp. 579 (E.D.Ark.1980), provides as exhaustive a discussion of legal developments in this area as is necessary at the trial court level. The section of his opinion entitled Development of the Law is specifically incorporated herein by reference. As noted in the *Roundtable* opinion, the Supreme Court's most recent voter dilution case is *Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). It is primarily in light of the decision and opinions in *Mobile* that the case at bar must be judged.

The Court notes preliminarily, however, that under the legal standards extant before the *Mobile* case, plaintiffs would be entitled to no relief because they have not demonstrated they have less opportunity than other groups of citizens to participate in the political processes of West Helena. See *Whitcomb v. Chavis*, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971); *Dove v. Moore*, 539 F.2d 1152, 1155; *Leadership Roundtable v. City of Little Rock, supra*, 499 F.Supp. at 592.

In *City of Mobile v. Bolden*, Justice Stewart's plurality opinion holds that proof of a racially discriminatory motive is essential for a plaintiff to prove a violation of either the Fourteenth or Fifteenth Amendments. "[A]ction by a state that is racially neutral on its face violates the Fifteenth Amendment only if motivated by a discriminatory purpose." *Mobile v. Bolden, supra*, 446 U.S. at 62, 100 S.Ct. at 1497. In the instant case, despite the State of Arkansas' history of official racial discrimination, plaintiffs failed to show that either West Helena's adoption of the at-large method of electing aldermen or the State's adoption of Ark. Stat.Ann. §§ 19–1002.5 and 19–1002.7 was motivated by a discriminatory purpose. The statement of the Court of Appeals in *Dove v. Moore, supra*, 539 F.2d at 1155, approving a similar political system employed by the City of Pine Bluff, seems pertinent: "While the at-large system is not designed to maximize the number of minority candidates elected, it serves other values [24] and is not an unconstitutional means of implementing the democratic process.

Justice Stewart's opinion makes clear that the Fifteenth Amendment imposes only one limitation on the states: "It forbids them to discriminate against Negroes in matters having to do with voting." 446 U.S. at 61, 100 S.Ct. at 1496. The parties' stipulation in the instant case that all registered voters in West Helena can vote for the candidate of their choice from those electing to be candidates for municipal office is conclusive as to plaintiffs' claim under the Fifteenth Amendment. See *Mobile, supra*, 446 U.S. at 65, 100 S.Ct. at 1498–1499.

Moreover, Justice Stewart holds that the protection afforded by Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, is coterminous with the Fifteenth Amendment and adds nothing to plaintiffs' Fifteenth Amendment claim.

There remains for consideration plaintiffs' contention that the defendants' at-large election system violates the Fourteenth Amendment. The Court will examine this argument in light of the plurality opinion in *Mobile* and also in light of the

---

**24.** See *Mobile v. Bolden*, 446 U.S. 55, 71 n.15, 100 S.Ct. 1490, 1502, n.15, 64 L.Ed.2d 47, where it is noted that "a system of at-large city elections in place of election of city officials by the voters of small geographic wards was universally heralded not many years ago as a praiseworthy and progressive reform of corrupt municipal government."

analyses proposed in the various separate opinions in that case.

■ Justice Stewart's opinion for four members of the Court notes that multi-member legislative districts have not been held to be unconstitutional *per se.* He states, however, "such legislative apportionments could violate the Fourteenth Amendment if their purpose were invidiously to minimize or cancel out the voting potential of racial or ethnic minorities. [Citations omitted.] To prove such a purpose, it is not enough to show that the group allegedly discriminated against has not elected representatives in proportion to its numbers. [Citations omitted.] A plaintiff must prove that the disputed plan was 'conceived or operated as [a] purposeful devic[e] to further racial ... discrimination.'" [Citation omitted.] 446 U.S. at 66, 100 S.Ct. at 1499. Justice Stewart cites *Washington v. Davis* to support "the basic principle that only if there is purposeful discrimination can there be a violation of the Equal Protection Clause of the Fourteenth Amendment." *Id.* The opinion elaborates in a footnote on the nature of the discriminatory animus which must be shown to make out an Equal Protection violation: "'Discriminatory purpose' ... implies more than intent as volition or intent as awareness of consequences ... It implies that the decision maker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." 446 U.S. at 72 n.17, 100 S.Ct. at 1502 n.17, quoting *Personnel Administrator of Mass. v. Feeney,* 442 U.S. 256 at 279, 99 S.Ct. 2282, at 2296, 60 L.Ed.2d 870.

■ Also worthy of note is Justice Stewart's observation concerning the relevancy of historical discrimination by the state to the claim at bar: "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful. The ultimate question remains whether a discriminatory motive has been proved in a given case." Thus, this Court must not rely too heavily on this State's history of discrimination in assessing the constitutionality of West Helena's at-large electoral system.

■ With these points from Justice Stewart's opinion in mind, the Court makes the following legal conclusions with respect to plaintiffs' Fourteenth Amendment claim:

1) Citizens of West Helena register and vote in municipal elections for the candidates of their choice without hindrance and no group is denied access to the political system.

2) Although there is substantial evidence of bloc voting, particularly in the Black Voting Areas, the support of Blacks may be necessary to win elections and accomplish some political objectives in West Helena.

3) The City Council does and has maintained a policy of open meetings in which the grievances of any group may be heard. Blacks have often been heard by the Council and, although the Council has often failed to act favorably on their requests, in every instance cited the grievance was acknowledged and discussed.

4) There was no showing that West Helena's adoption of the at-large method of election of aldermen when the city was incorporated as a city of the first class in 1920 was motivated in any way by a desire to effect or perpetuate racial discrimination.

5) The evidence was not persuasive that the at-large method of aldermanic elections has been retained because of a desire to perpetuate racial discrimination. Rather, the more persuasive evidence was that the City has retained the present system primarily because of a belief that at-large elections best serve the interest of the city as a whole. Ward elections, it is believed, would result in the accentuation of "local" interests at the expense of the common needs of the general population.

6) Although candidates run for particular positions, because they are elected by a plurality head-to-head contests are not inevitable.

7) There was some evidence of past discrimination by the City in employment and in the delivery of municipal services. This is, however, "most tenuous and circumstantial evidence of the constitutional invalidity of the electoral system." *Mobile, supra*, 446 U.S. at 74, 100 S.Ct. at 1503. While instances of discrimination by the City in employment or services may entitle plaintiffs to some legal relief, it would be of a far different sort from that sought here.

8) The City of West Helena and its citizenry has a substantial interest in maintaining the present system of at-large elections.

Because the *Mobile* case does not contain an opinion speaking for a majority of the Court, it seems advisable to assess plaintiffs' claim in light of the analyses suggested in the various separate opinions as well.

Justice Blackmun's opinion, concurring in the result, assumes that proof of intentional discrimination is a prerequisite to a constitutional claim of vote dilution. Yet he found, in agreement with Justice White, that the record in the *Mobile* case "amply support[s] an inference of purposeful discrimination." 446 U.S. at 80, 100 S.Ct. at 1507. Justice Blackmun voted to reverse based on his belief that the remedy afforded by the District Court and approved by the Court of Appeals was an abuse of judicial discretion. His opinion offers no support for plaintiffs' claim in the instant case.

■ Justice Stevens, concurring in the judgment, takes a somewhat different approach to allegations of vote dilution. He would find the Fifteenth Amendment applies to such cases based on the Court's historic opinion in *Gomillian v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110. And he indicates that both the Fourteenth and Fifteenth Amendments may condemn gerrymanders aimed at racial minorities and also those aimed at other social and political groups. While acknowledging that the Constitution does not establish a right to proportional representation by minorities, Justice Stevens posits a three-prong

test for cases alleging gerrymandering or vote dilution: (1) Whether the districting configuration chosen was " 'uncouth,' that is to say, was manifestly not the product of a routine or traditional political decision;" (2) whether the scheme "had a significant adverse impact on a minority group;" (3) whether the districting scheme was "unsupported by any neutral justification and thus was either totally irrational or entirely motivated by a desire to curtail the political strength of the minority." 446 U.S. at 90, 100 S.Ct. at 1512. The test or criteria articulated by Justice Stevens focuses more on the objective effects of a political decision than the motivation of the decision maker. Moreover, he concedes "that a political decision that affects group voting rights may be valid even if it can be proved that irrational or invidious factors have played some part in its enactment or retention." *Id.* at 91, 100 S.Ct. at 1512. Human motives are, of course, rarely pure.

When the Stevens criteria are applied to the present case, it is clear that the plaintiffs' cannot succeed. First, the use of at-large aldermanic elections is not "uncouth" or offensive; rather its selection and retention by West Helena has been the product of a traditional political decision. Second, it is not clear that the scheme of at-large elections has a significant impact on the minority group, particularly in light of the suggested alternative, which would likely assure blacks of permanent minority representation on the City Council with the majority of white council members having no accountability to the black population. Third, the at-large election scheme is not totally irrational and is supported by neutral justifications.

The Court finds it inappropriate to analyze this case under the theories expressed in the dissenting opinions of Justices White and Marshall. We express no opinion as to the hypothetical outcome of this case were those theories applied.

■ There remains for consideration, however, plaintiffs' claim that the existing wards of West Helena are not substantially

equal in size as required by Arkansas law. See Ark.Stat.Ann. § 19–1002.7. The Court concludes that the issues presented by the large disparity in size of the West Helena wards must be resolved in a proceeding before the Circuit Court of Phillips County, as prescribed by Ark.Stat.Ann. § 19–1005 (Repl.1980), rather than in this Court. Section 19–1005 provides a novel and streamlined procedure whereby 100 citizens of a city may petition the Circuit Judge of the county in which the city is located for an order appointing a commission to re-draw the lines of unequal wards. Such a commission consists of three members, and is empowered "to divide the city into such number of wards, having as nearly equal population as practicable, as, in their opinion, will best subserve the true interests of the citizens and taxpayers of such city." The statute further provides for the circuit judge to hold a hearing on the petition not less than three days after its presentation. If the judge finds the allegations to be of sufficient merit to warrant appointment of a commission, the commissioners are directed to develop a proposal for redividing the city and to submit their proposal to the judge within ten days of their appointment. If the judge approves the proposal, it is filed in the office of the Circuit Clerk and then becomes the official division of the city into wards. Moreover, the actions of the circuit judge are "final and not subject to any appeal", which presumably accounts for the lack of any decisions by the Arkansas Supreme Court construing the statute.

For purposes of our decision to refer plaintiffs to the Phillips County Circuit Court under § 19–1005, the Court assumes without deciding that the plaintiffs have demonstrated the violation of both a federal right under the "one man, one vote" principle, and a violation of a right under Arkansas law. Both of these assumptions are not, however, free from doubt. First, it is questionable that reapportionment cases, such as *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), would condemn the unequal wards in West Helena since all aldermen are elected city-wide. A vote in one ward has as much weight in a city-wide election as does a vote in any other ward. Additionally, although the public policy expressed in Ark.Stat.Ann. § 19–1005 and 19–1002.7 clearly favors wards of equal size, it is not clear that these statutes *require* wards of equal size when the city-wide election method is employed. Nonetheless, the Court assumes *arguendo* that plaintiffs have demonstrated the existence and violation of a federal right and a state right which would ordinarily be subject to this Court's pendent jurisdiction. The Court's conclusion is that despite the general rule against requiring exhaustion of state administrative or judicial remedies in suits under § 1983, we must refer the plaintiffs to the remedy provided in Ark.Stat.Ann. § 19–1005.

Our conclusion in this regard is supported by cases such as *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1942), and *Alabama Public Service Commission v. Southern Ry. Co.*, 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951). Although these cases have often been discussed in the context of the abstention doctrine, *see e. g., Currie, Federal Courts: Cases and Materials*, 674–677 (2d ed. 1975); Note, 73 *Yale L.J.* 850 (1964), the better interpretation of the *Burford* and *Alabama* cases seems to be that they are not abstention cases at all. Rather, they have been interpreted as manifestations of the equitable doctrine of comity. *See* Liebenthal, "A Dialogue on England: The England Case, Its Effect on the Abstention Doctrine, and Some Suggested Solutions," 18 *Western Reserve Law Review*, 157–165 (1966).

The *Burford* and *Alabama* cases are, of course, distinguishable from the case at bar in that they specifically require federal courts to give deference to state *regulatory* schemes, including the states' established patterns of judicial review. Yet certain special factors involved in the Arkansas statutory proceeding lead this Court to deny federal relief on the basis of comity. First, the Court is impressed with the speed with which action may be taken under § 19–1005. The hearing on the petition must be held within three days of its pre-

sentation, and the commission must report its proposal within ten days. It seems unlikely that this Court could act with such dispatch. Second, the Commission contemplated by the statute seems to have some aspects of a regulatory commission. Its proceedings may be expected to be somewhat informal and thus better suited to the resolution of this knotty problem. Moreover, the geography of problem-solving indicates that local people familiar with the particulars of the City are likely to be more adept at re-drawing their ward boundaries than would be this Court. Third, that § 19–1005 allows for no appeal from the Circuit Court's determination seems favorable in that implementation of the right will not be delayed by lengthy appellate court proceedings.

For the reasons stated in this opinion, it is hereby ordered that the complaint be dismissed and the relief prayed for denied.