675 F.2d 201
 Reverend P. L. PERKINS, Phillips County Concerned Citizens,
Sam Bennett, John Hamilton, Mrs. Lillie Mae Stevens, Wilson
Rodgers, Reverend Julius McGruder, Welton Davis, Reverend C.
W. Gilcreast and Orta Bush, Appellants,
v.
CITY OF WEST HELENA, ARKANSAS, Mayor Jesse Porter; City
Councilmen Bob Teeter, Dick Cunningham, Tommie
Dial, Charles Miles and Dwight Galloway,
Appellees.
 No. 81-1516.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Nov. 12, 1981.
Decided April 13, 1982.
 
 William L. Robinson, Norman J. Chachkin, Lezli Baskerville, Lawyers' Committee for Civ. Rights Under Law, Washington, D. C., for amicus curiae.
 Kaplan, Hollingsworth, Brewer & Bilheimer, P. A. Hollingsworth, Janet L. Pulliam, Little Rock, Ark., for appellants.
 Ralph C. Murray, City Atty., West Helena, Ark., and Byron Freeland, Mitchell, Williams & Selig, Little Rock, Ark., for appellees.
 Steve Clark, Atty. Gen. by R. B. Friedlander, Asst. Atty. Gen., Little Rock, Ark., for State of Ark.
 Before HEANEY and McMILLIAN, Circuit Judges, and REGAN,* Senior District Judge.
 HEANEY, Circuit Judge.
 
 
 1
 Plaintiffs appeal from a decision of the United States District Court for the Eastern District of Arkansas, 514 F.Supp. 770, which held that the at-large system of electing aldermen in the City of West Helena, Arkansas, was neither adopted or maintained for the purpose of denying black citizens their rights under the Fourteenth or Fifteenth Amendments to the United States Constitution, or Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973. We affirm the district court's finding that at-large voting was not adopted for an unconstitutional or illegal purpose. We reverse, however, its finding that at-large voting was not maintained for an unlawful purpose. We hold that the direct and circumstantial evidence in this case establishes that the defendants have retained West Helena's at-large electoral system to intentionally deprive black voters of their rights in violation of the Fourteenth and Fifteenth Amendments, and the Voting Rights Act of 1965. We remand to the district court with directions to devise a remedy that will fully protect the voting rights of black voters in West Helena.
 
 
 2
 I. FACTS.
 
 
 3
 The plaintiffs are citizens of the City of West Helena, Arkansas.[1] The population of West Helena is approximately forty percent black and sixty percent white. Since 1920, the city has been governed by a council consisting of eight aldermen. It is divided into four wards for the purpose of electing aldermen. The ward lines have not changed since 1920. The white residents and black residents generally live separate and apart from each other. Wards 2 and 3 are entirely white. Parts of Wards 1 and 4 are also white. The other parts of Wards 1 and 4 are "black wards" separated from the white areas by a railroad track. There is a large disparity in the population of the wards. Wards 2 and 3 contain only twenty-seven percent of the city's population, while seventy-three percent of the population reside in Wards 1 and 4.
 
 
 4
 Candidates for aldermanic positions must reside in the ward from which they seek to be elected. There are two positions in each ward, and each candidate is required to specify the "seat" or "post" for which he or she is running within the ward of his or her residence. All candidates then run for election on an at-large basis. The entire electorate is required to vote for two candidates from each ward. Single-shot voting is effectively prohibited under Arkansas law. Candidates, however, must only receive a plurality of votes cast to win an election, and there are no runoffs. Historically, West Helena's municipal elections have been characterized by "bloc voting" polarized along racial lines.
 
 
 5
 Under this electoral scheme, no black has ever been elected in a "head-to-head" contest against a white candidate. Only three black candidates have ever been elected to the city council, and in each case, the black candidate ran against at least two white candidates. Moreover, when these black incumbents stood for reelection, each was opposed by only one white candidate; and, in each instance, the black was defeated.
 
 
 6
 The record establishes that West Helena's municipal government has been unresponsive to the needs of black citizens, and blacks have been denied equal access to public housing, municipal boards and commissions, municipal employment and city services. Since at least 1977, blacks have petitioned the council members to be more responsive to the black community and to change the electoral system from at-large elections to elections by ward. Few changes have been made in response to black demands and the requests for ward elections have been rejected.
 
 
 7
 On October 20, 1978, a group of black "concerned citizens" instituted this action to enjoin the continued use of at-large elections for city aldermen in West Helena. They alleged that the at-large election scheme was adopted and has been maintained for the purpose of diluting black voting strength[2] in violation of the Fourteenth and Fifteenth Amendments, and section 2 of the Voting Rights Act. They additionally contended that the population in the four city wards is not substantially equal as required by Arkansas law, and they sought to have the district court exercise its pendent jurisdiction to reapportion the wards.
 
 
 8
 After trial, the district court held that the plaintiffs failed to establish their Fourteenth Amendment claim because they did not prove that the defendants created or maintained West Helena's at-large electoral system for a discriminatory purpose. It also held that the plaintiffs did not have a valid Fifteenth Amendment or Voting Rights Act claim because blacks were free to register and to vote in West Helena. Finally, the district court declined to exercise its pendent jurisdiction to address the issue of disparate ward populations. The plaintiffs appeal from these decisions.
 
 
 9
 II. DISCUSSION.
 
 
 10
 A. Introduction.
 
 
 11
 The Constitution of the United States protects the right of all qualified citizens to vote and to have their votes counted. Reynolds v. Sims, 377 U.S. 533, 554, 84 S.Ct. 1362, 1377, 12 L.Ed.2d 506 (1964).[3] Indeed, the Supreme Court has recognized that "(t)he right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." Reynolds v. Sims, supra, 377 U.S. at 554, 84 S.Ct. at 1377. Moreover, because "the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." Id. at 560, 84 S.Ct. at 1380.
 
 
 12
 At-large voting is not per se unconstitutional. E.g., City of Mobile v. Bolden, 446 U.S. 55, 57, 100 S.Ct. 1490, 1494, 64 L.Ed.2d 47 (1980); White v. Regester, 412 U.S. 755, 765, 93 S.Ct. 2332, 2339, 37 L.Ed.2d 314 (1973). No group, even if racially identifiable, has a right to elect representatives proportionate to its voting power in the community. City of Mobile v. Bolden, supra, 446 U.S. at 79, 100 S.Ct. at 1506; Whitcomb v. Chavis, 403 U.S. 124, 149, 91 S.Ct. 1858, 1872, 29 L.Ed.2d 363 (1971). Nonetheless, "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." Reynolds v. Sims, supra, 377 U.S. at 555, 84 S.Ct. at 1378. Thus, a vote dilution claim is a cognizable constitutional cause of action under the appropriate circumstances. City of Mobile v. Bolden, supra, 446 U.S. at 65-66, 100 S.Ct. at 1498-99; White v. Regester, supra, 412 U.S. at 765-766, 93 S.Ct. at 2339; Leadership Roundtable v. City of Little Rock, 661 F.2d 701 (8th Cir. 1981); Lodge v. Buxton, 639 F.2d 1358, 1363 (5th Cir. 1981).
 
 
 13
 B. City of Mobile v. Bolden.
 
 
 14
 To determine whether the plaintiffs have established their vote dilution claim, we begin with the Supreme Court's decision in City of Mobile v. Bolden, supra, 446 U.S. 55, 58, 100 S.Ct. 1490, 1495, 64 L.Ed.2d 47 (1980). In Bolden, the Supreme Court reversed a decision of the Fifth Circuit Court of Appeals which had held that Mobile's at-large system of electing city council members discriminated against black voters in violation of the Fourteenth and Fifteenth Amendments. Id. at 67, 100 S.Ct. at 1499. The standards established in Bolden, however, are difficult to discern because no view of the justices commanded a clear majority, and six separate opinions were published.
 
 
 15
 Justice Stewart, writing for the plurality,[4] found that the Fifteenth Amendment is violated only by purposeful discrimination that directly interferes with the rights of blacks to register and to vote. He concluded that "(h)aving found that Negroes in Mobile, 'register and vote without hindrance,' the District Court and Court of Appeals were in error in believing that the appellants invaded the protection of (the Fifteenth) Amendment in the present case." Id. at 65, 100 S.Ct. at 1498.
 
 
 16
 With respect to the Fourteenth Amendment, Justice Stewart wrote that to establish a claim of unconstitutional vote dilution, "it is not enough to show that the group allegedly discriminated against has not elected representatives in proportion to its numbers. A plaintiff must prove that the disputed plan was 'conceived or operated as (a) purposeful device to further racial * * * discrimination.' " Id. at 66, 100 S.Ct. 1499 (footnote omitted). The plurality then found that the evidence of purposeful discrimination was insufficient to prove a Fourteenth Amendment violation. Id. at 72-74, 100 S.Ct. at 1503.
 
 
 17
 Justice Stevens concurred in the judgment. He agreed with the plurality that no constitutional violation had been established, but he relied on an alternative test. Id. at 90-94, 100 S.Ct. at 1512-14 (Stevens, J., concurring in judgment). He stated that "a proper test should focus on the objective effects of the political decision rather than the subjective motivation of the decisionmaker." Id. at 90, 100 S.Ct. at 1512. Under this test, the appropriate inquiry is whether the election scheme
 
 
 18
 (1) * * * was manifestly not the product of a routine or a traditional political decision; (2) * * * had a significant adverse impact on a minority group; and (3) * * * was unsupported by any neutral justification and thus was either totally irrational or entirely motivated by a desire to curtail the political strength of the minority.
 
 
 19
 Id. at 90, 100 S.Ct. at 1512.
 
 
 20
 Justice Stevens concluded that a vote dilution claim is cognizable under both the Fourteenth and Fifteenth Amendments. Id. at 84, 100 S.Ct. at 1509.
 
 
 21
 Justice Blackmun agreed with Justice White's dissenting opinion which concluded that the plaintiffs had proven purposeful discrimination, and that both the Fourteenth and Fifteenth Amendments could be violated by the vote dilution. Id. at 80, 100 S.Ct. at 1507 (Blackmun, J., concurring in result). Justice Blackmun, however, concurred in the result reached by the plurality because he found that the district court's remedy was "not commensurate with the sound exercise of judicial discretion." Id. at 80, 100 S.Ct. at 1507. He objected to the order requiring Mobile to totally replace its seventy-year-old commission form of government with a mayor-council system. Id. at 82, 100 S.Ct. at 1508.
 
 
 22
 In separate dissents, Justices Brennan, White and Marshall each concluded that the plaintiffs had established that the votes of blacks were unconstitutionally diluted by Mobile's purposeful discrimination. Id. at 94, 103, 136-139, 100 S.Ct. at 1514, 1518, 1537-39 (Brennan, White, Marshall, JJ., dissenting). Moreover, Justices Brennan and Marshall said that proof of discriminatory impact alone was sufficient to support a constitutional claim. Id. at 94, 104, 100 S.Ct. at 1514, 1520. Finally, Justices Marshall and White stated that a vote dilution challenge is a valid Fifteenth Amendment, as well as Fourteenth Amendment, claim. Id. at 103, 126, 100 S.Ct. at 1518, 1532.
 
 
 23
 C. The Law after Bolden.
 
 
 24
 A threshold question involves the constitutional basis of a vote dilution claim. There is no doubt-even after Bolden-that a plaintiff bringing a vote dilution claim may challenge an electoral system on the ground that it violates the Equal Protection Clause of the Fourteenth Amendment. E.g., Lodge v. Buxton, supra, 639 F.2d at 1372; Leadership Roundtable v. City of Little Rock, 499 F.Supp. 579, 583-584 (E.D.Ark.1980), aff'd, 661 F.2d 701 (8th Cir. 1981). The district court properly recognized this fact.
 
 
 25
 Plaintiffs' claim of racially discriminatory vote dilution is also cognizable under the Fifteenth Amendment.[5] Washington v. Finlay, 664 F.2d 913, 919 (4th Cir. 1981); Lodge v. Buxton, supra, 639 F.2d at 1373; United States v. Uvalde Consolidated Independent School District, 625 F.2d 547, 552 (5th Cir. 1980), cert. denied, 451 U.S. 1002, 101 S.Ct. 2341, 68 L.Ed.2d 858 (1981). But see McMillan v. Escambia County, Florida, 638 F.2d 1239, 1242 (5th Cir.), cert. dismissed, --- U.S. ----, 102 S.Ct. 17, 71 L.Ed.2d ---- (1981). Although the four members of the Bolden plurality concluded that the Fifteenth Amendment only prohibits official action denying blacks the right to register and vote, City of Mobile v. Bolden, supra, 446 U.S. at 64-65, 100 S.Ct. at 1498-99; a majority of the Court apparently concluded that the Fifteenth Amendment protects more than this mechanical right. Five justices indicated that the Fifteenth Amendment also protects against vote dilution that limits the effective-not merely technical-access of blacks to the political process. See id. at 80, 84, 94, 103, 126-129, 100 S.Ct. at 1506, 1509, 1514, 1518, 1532-1534 (Blackmun, J., concurring in result); Stevens, J., concurring in judgment); (Brennan, White and Marshall, JJ., dissenting).[6]
 
 
 26
 Therefore, the district court erred as a matter of law when it dismissed the plaintiffs' Fifteenth Amendment claim on the ground that:
 
 
 27
 Justice Stewart's (plurality) opinion makes clear that the Fifteenth Amendment imposes only one limitation on the states: "It forbids them to discriminate against Negroes in matters having to do with voting." 446 U.S. at 61, 100 S.Ct. at 1496. The parties' stipulation in the instant case that all registered voters in West Helena can vote for the candidate of their choice from those electing to be candidates for municipal office is conclusive as to plaintiffs' claim under the Fifteenth Amendment. See Mobile, supra, 446 U.S. at 65, 100 S.Ct. at 1498.
 
 
 28
 The focus of a vote dilution claim under the Fifteenth Amendment, like such a claim under the Fourteenth Amendment, is whether minority voters are denied the opportunity to participate effectively in the political process-not whether they are officially permitted to register and vote under the law.[7] E.g., Lodge v. Buxton, supra, 639 F.2d at 1362. See City of Mobile v. Bolden, supra, 446 U.S. at 65, 100 S.Ct. at 1498 (plurality opinion) (Fifteenth Amendment not violated because blacks "register and vote without hindrance." (emphasis added) ).
 
 
 29
 The next issue is whether discriminatory intent must be proven to establish a claim of unconstitutional vote dilution. Under the Fourteenth Amendment, it is clear that a vote dilution claim is cognizable only if such intent is established. Washington v. Finlay, supra, 664 F.2d at 919; Lodge v. Buxton, supra, 639 F.2d at 1363; Leadership Roundtable v. City of Little Rock, supra, 499 F.Supp. at 592, aff'd, 661 F.2d at 701. A Fifteenth Amendment violation may also be established by such a showing of purposeful discrimination.[8] Washington v. Finlay, supra, 664 F.2d at 919; Lodge v. Buxton, supra, 639 F.2d at 1375.
 
 
 30
 The Supreme Court in Bolden left unanswered the question of what evidence is necessary to establish proof of discriminatory purpose. Direct evidence of such purpose is obviously entitled to great weight. There is such direct evidence here. Moreover, circumstantial evidence of discriminatory intent will also suffice. City of Mobile v. Bolden, supra, 446 U.S. at 73, 101-103, 100 S.Ct. at 1503, 1517-19; Lodge v. Buxton, supra, 639 F.2d at 1363.[9] The precise nature and extent of the evidence necessary to establish discriminatory intent is, however, fraught with ambiguity after Bolden. While four Justices were satisfied with the Fifth Circuit's so-called Zimmer criteria,[10] City of Mobile v. Bolden, supra, 446 U.S. at 80, 94, 101-102, 135 n.33, 100 S.Ct. at 1506, 1514, 1518-19, 1537 n.33 (Blackmun, J., concurring in result; Brennan, White, Marshall, JJ., dissenting), four justices rejected these factors as being conclusive of discriminatory purpose. Id. at 72-73, 100 S.Ct. at 1503 (plurality opinion). Justice Stevens rejected the use of the Zimmer criteria to draw an inference of intent because he concluded that the question of intent is not relevant to the disposition of vote dilution cases.[11] Id. at 90, 100 S.Ct. at 1512.
 
 
 31
 After reviewing the various Bolden opinions, the Fifth Circuit in Lodge v. Buxton, supra, 639 F.2d at 1373, stated:
 
 
 32
 We conclude that (the Supreme Court in Bolden) rejected the use of the Zimmer criteria to the extent that this Court, in Bolden presumed the existence of a discriminatory purpose from the proof of some of those factors. We believe the Court rejected the use of such a quantitative weighing approach, requiring instead an independent inquiry into intent. Additionally, we think the Supreme Court was directing all courts making the inquiry to apply the Zimmer criteria only to the extent that they are relevant to the factual context at hand and, to the extent they are not so relevant, to employ other criteria. Finally, it appears that the Supreme Court has somewhat increased the burden of proof on plaintiffs in such cases. (Emphasis included.)
 
 
 33
 We agree with the Fifth Circuit. The Zimmer criteria, to the extent that they are relevant, may be used to determine whether a discriminatory purpose can be inferred. Not only were four justices satisfied in Bolden that the Court of Appeals had correctly relied on the Zimmer criteria to infer an invidious intent, the plurality conceded that the Zimmer factors "may afford some evidence of discriminatory purpose." City of Mobile v. Bolden, supra, 464 U.S. at 73, 100 S.Ct. at 1503. Moreover, the Zimmer factors are plainly derived from the Supreme Court's decisions in White v. Regester, supra, 412 U.S. at 766-769, 93 S.Ct. at 2339-2341, and Whitcomb v. Chavis, supra, 403 U.S. at 143-149, 91 S.Ct. at 1869-1872. See City of Mobile v. Bolden, supra, 446 U.S. at 101, 100 S.Ct. at 1517 (White, J., dissenting); Note, City of Mobile v. Bolden: A Setback in the Fight Against Discrimination, Brooklyn L.Rev. at 190-192. And all of the Bolden opinions expressly reaffirmed the continuing vitality of the vote dilution principles of White and Whitcomb.
 
 
 34
 The absence or presence of some, or all, of the Zimmer factors, however, is not conclusive of the discriminatory purpose issue. Lodge v. Buxton, supra, 639 F.2d at 1373-1375. The plurality clearly believed that the exclusive use of the Zimmer criteria was "inconsistent with (the Supreme Court's) decisions in Washington v. Davis (426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597) and Arlington Heights (v. Metropolitan Housing Development Corp.)." City of Mobile v. Bolden, supra, 446 U.S. at 73, 100 S.Ct. at 1503 (citations omitted). Thus, to the extent that they are relevant, the factors articulated in Arlington Heights v. Metropolitan Development Housing Corp., supra, 429 U.S. 252, at 266-268, 97 S.Ct. 555 at 564-565, 50 L.Ed.2d 450, also should be employed to determine whether a discriminatory purpose can be inferred in a particular case. See McMillan v. Escambia County, Florida, supra, 638 F.2d at 1243. See generally Note, Discriminatory Purpose and Disproportionate Impact: An Assessment After Feeney, 79 Colum.L.Rev. 1376 (1979). These factors include discriminatory impact, historical background, specific events leading up to the challenged decision, departures from the normal procedural sequence, substantive departures from the normal decision-making process, legislative or administrative history, and any other direct or circumstantial evidence relevant to intent. Arlington Heights v. Metropolitan Housing Development Corp., supra, 429 U.S. at 266-268, 97 S.Ct. at 564-565 (1977).
 
 
 35
 To summarize, a vote-dilution claim will succeed under the Fourteenth Amendment only if the at-large electoral system was created or maintained for a discriminatory purpose. In determining whether a discriminatory purpose existed, no set of factors, including those suggested in Zimmer and Arlington Heights, is dispositive of the question of intent. Instead, all factors must be considered to the extent that they are relevant to the question of intent. Moreover, even if all of the Zimmer and Arlington Heights factors are established, an inference of discriminatory intent is not necessarily to be drawn. The district court must consider the totality of circumstances to determine whether the at-large electoral system was created or maintained to accord the members of the allegedly injured group less opportunity than other voters to participate meaningfully in the political process and elect legislators of their choice.
 
 
 36
 D. The Present Case.
 
 
 37
 To determine whether the district court erred in finding that the defendants here did not engage in purposeful discrimination, we must examine its factual finding and conclusions of law in light of all relevant facts and circumstances under the standards we articulated above.
 
 
 38
 1. Minority Access to the Political Process.
 
 
 39
 The district court drew the express legal conclusion that "(c)itizens of West Helena register and vote in municipal elections for the candidate of their choice without hindrance and no group is denied access to the political process." We cannot agree.
 
 
 40
 The district court based its conclusion primarily on the parties' stipulation that "all registered voters residing in West Helena, Arkansas, can vote for the candidate of their choice from those selecting to be a candidate for municipal office." The court also found that blacks have engaged in voter registration drives with some success and that blacks have served as election judges at polling places. These specific factual findings are not clearly erroneous. Nonetheless, they are not sufficient to support the court's legal conclusion in view of the additional factual findings by the district court and other evidence in the record.
 
 
 41
 The district court found that impediments to blacks voting and registering still exist at present. Specifically, it found that "such factors as illiteracy, feelings of inferiority by some because of their occupations, apprehension on the part of welfare recipients about the possible consequences of their active participation in the election consequences and an attitude that their vote will not be significant has kept some blacks from registering and voting" and that "polling places in some of the black voting areas are not ideal and may discourage some voters."
 
 
 42
 The district court determined that black candidates cannot campaign effectively in white areas of West Helena because of deep-rooted racial discrimination. Moreover, the record reveals that black candidates have been denied the opportunity to speak to all-white service and business groups during campaigns, but that white candidates have been permitted to address these organizations. The plaintiffs emphasize, in particular, the activities of the West Helena Promotional Association, a group of white business and civic leaders. The district court found that the Association was not engaged in any formal or concerted political activity. In our view, the record supports this finding only insofar as it relates to formal political activities. The record also shows that the Association gave financial and organizational support to the candidacy of the present white mayor in the 1978 election, and that it informally supported other white candidates for the city council in other recent elections.
 
 
 43
 The district court found that blacks traditionally have been excluded from almost all city boards and commissions. While the district court noted that there has been some improvement since about 1975, it found that blacks are still underrepresented on municipal boards and commissions in proportion to their population.
 
 
 44
 The impediments to registering and voting, inability to campaign effectively in white areas and before white service and business groups, and underrepresentation on municipal boards and commissions, all are evidence of the fact that blacks in West Helena cannot participate meaningfully in the political process. Lodge v. Buxton, supra, 639 F.2d at 1379. In particular, the evidence of present interference with the rights of blacks to register and vote is significant given the plurality position in Bolden that the Fifteenth Amendment is violated only by acts directly impinging upon the right to register and vote. Id. at 1377 & n.38. Consequently, we cannot agree with the district court's conclusion that black citizens of West Helena can register and vote for candidates of their choice without hindrance and that they are not denied access to the political process. The fact is that impediments to registering and voting are placed in the way of blacks and that they have been denied the opportunity to participate fully in West Helena's political process.
 
 
 45
 2. Responsiveness of Elected Officials to Minority Interests.
 
 
 46
 The district court concluded that the city council conducts open meetings accessible to blacks to voice their grievances. It further found, however, that "the Council has often failed to act favorably on their requests." Moreover, the city council, despite its authority to redraw ward boundaries, has not acceded to the requests of blacks to redistrict West Helena.
 
 
 47
 Furthermore, the district court found that blacks either have no representation or are grossly underrepresented on city commissions, and as employees of the police, fire and water departments. The first black was admitted to the police department in 1970, and no blacks were on the fire squad until 1978. Moreover, the municipal services received by blacks are generally inferior to those provided for whites. For example, some black areas of the city have no street paving, inadequate drainage, inadequate and poorly maintained park facilities and, in some areas, no sewer or water service.[12] Public housing in West Helena remained segregated until 1979. Schools remained segregated until 1970.
 
 
 48
 The district court's findings of fact are amply supported by the evidence in this case. The record establishes that the West Helena city council has continuously failed to "voluntarily" respond to the needs and concerns of blacks, despite their direct appeals. Absent such drastic measures as demonstrations, protests or lawsuits, the council has not responded affirmatively to the legitimate concerns of black citizens. The evidence is clear that, in the past, the municipal government in West Helena has been unresponsive to the needs and concerns of black citizens, and that such unresponsiveness continues today. Such unresponsiveness is probative of a finding that the at-large system is being maintained for a discriminatory purpose. Washington v. Finlay, supra, 664 F.2d at 919-921; Lodge v. Buxton, supra, 639 F.2d at 1374-1375.
 
 
 49
 3. History of Discrimination.
 
 
 50
 The plurality in Bolden observed that "past discrimination cannot, in the manner of original sin, condemn action that is not in itself unlawful." City of Mobile v. Bolden, supra, 446 U.S. at 74, 100 S.Ct. at 1503. Nonetheless, evidence of historical discrimination is relevant to the question of invidious intent to the extent it affects a minority group's present opportunity to participate effectively in the electoral process. Lodge v. Buxton, supra, 639 F.2d at 1358. See Arlington Heights v. Metropolitan Housing Development Corp., supra, 429 U.S. at 267, 97 S.Ct. at 564; White v. Regester, supra, 412 U.S. at 766-767, 93 S.Ct. at 2339.
 
 
 51
 The district court found that West Helena has a long history of invidious discrimination in the election process. After reconstruction, Arkansas, along with other southern states, began to pass a series of acts to disenfranchise blacks. For example, in 1891, Arkansas passed the Election Code to begin restricting the right of blacks to vote. In 1895, the legislature continued the disenfranchisement of blacks with the passage of the poll tax. By 1906, blacks had been nearly totally disenfranchised in Arkansas. In the event that any blacks retained the right to vote, the Democratic Party created a "whites only" primary. Blacks were not allowed to vote in the Democratic primary until Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944), and poll taxes were levied until 1965 when the Voting Rights Act was passed.
 
 
 52
 Moreover, this past discrimination has reduced the present opportunity of blacks to participate in the political process. The record shows that the effects of these discriminatory election laws has been to discourage some blacks from exercising their right to vote today. 514 F.Supp. at 774. Similarly, past discrimination has contributed to socio-economic depression among blacks. The district court found that "(o)n average, the whites have significantly more years of formal education, less unemployment, more income and better housing." The district court further found that this socio-economic depression has discouraged some blacks from participating in the political process. Id. at 774. Moreover, past discrimination also has contributed to the underrepresentation of blacks on the city council and municipal boards and commissions which the district court found. Id. at 775. These factual findings are not clearly erroneous, and they are evidence of the fact that the at-large electoral system in West Helena has been maintained for a discriminatory purpose. Lodge v. Buxton, supra, 639 F.2d at 1377-1378.[13]
 
 
 53
 4. Mechanics of Voting System.
 
 
 54
 West Helena's at-large scheme does not have a majority vote requirement. As the district court found, this fact decreases the likelihood that West Helena's electoral system is being maintained for a discriminatory purpose. E.g., City of Mobile v. Bolden, supra, 446 U.S. at 101, 111, 100 S.Ct. at 1518, 1523 (White and Marshall, JJ., dissenting); Nevett v. Sides, 571 F.2d 209, 271 (5th Cir. 1978), cert. denied, 446 U.S. 951, 100 S.Ct. 2916, 64 L.Ed.2d 807 (1980).
 
 
 55
 On the other hand, West Helena's electoral system requires that candidates reside in the ward which they seek to represent, provides that candidates must run for a particular numbered "seat" or "post" within a ward, and effectively prohibits single-shot voting. These provisions, particularly when combined with racially polarized voting, significantly enhance the possibility that West Helena's election scheme is being maintained for a discriminatory purpose. E.g., Lodge v. Buxton, supra, 639 F.2d at 1380.
 
 
 56
 Of particular importance are the anti-single-shot voting provisions. Federal courts have repeatedly emphasized the importance of single-shot voting as a means of ameliorating the vote-diluting consequences of at-large elections. E.g., City of Rome v. United States, 446 U.S. 156, 183-185 & nn. 19 & 21, 100 S.Ct. 1548, 1565-1566 & nn. 19 & 21, 64 L.Ed.2d 119 (1980); White v. Regester, supra, 412 U.S. at 766, 93 S.Ct. at 2339; Thomasville Branch of the NAACP v. Thomas County, Georgia, 639 F.2d 1384, 1385 (5th Cir. 1981); Nevett v. Sides, supra, 571 F.2d at 223. Single-shot voting enables a minority group to win some at-large seats by concentrating the votes of its members behind a limited number of candidates while the vote of the majority is dividing among a number of candidates.[14] E.g., City of Rome v. United States, supra, 446 U.S. at 183 n.19, 100 S.Ct. at 1565 n.19.
 
 
 57
 Several provisions of Arkansas law frustrate single-shot voting by the black citizens of West Helena. Ark.Stat.Ann. § 19-1002.7 requires that when a first-class city with a mayor-council form of government chooses to elect aldermen at-large, as the City of West Helena has done, candidates must reside in the ward from which they seek election. Moreover, Ark.Stat.Ann. § 19-1002.6 requires that aldermanic candidates designate the "seat" or "post" (No. 1 or No. 2) they are seeking when they file as a candidate. Finally, Ark.Stat.Ann. § 19-1004 provides for staggered terms for each of the two aldermen running from each ward. Thus, the system does not operate in practice as it might appear from the non-majority vote provision emphasized by the district court. Rather than having a field of candidates with plurality winners-in which single-shot voting might result in minority representation-these provisions of Arkansas law may operate to separate one contest into a number of contests, thereby increasing the likelihood of "head-to-head" races and frustrating single-shot voting. City of Rome v. United States, supra, 446 U.S. at 185 & n.21, 100 S.Ct. at 1566 & n.21. The district court failed to note the effect of these anti-single-shot voting provisions on plurality vote requirements.
 
 
 58
 5. Discriminatory Impact.
 
 
 59
 While the Constitution does not guarantee every racial group elected representation in proportion to its members, City of Mobile v. Bolden, supra, 446 U.S. at 79, 100 S.Ct. at 1506 (plurality opinion), significant deviation from proportionate representation is indicative of discriminatory intent. Id. at 70, 100 S.Ct. at 1501 (plurality opinion), and 101, 122-123, 100 S.Ct. at 1517, 1529-1530 (White and Marshall, JJ., dissenting). See Arlington Heights v. Metropolitan Housing Development Corp., supra, 429 U.S. 266, 97 S.Ct. at 563; Washington v. Davis, 426 U.S. 229, 242, 96 S.Ct. 2040, 2049, 48 L.Ed.2d 597 (1976). Blacks have been significantly underrepresented on the West Helena city council. Blacks constitute forty percent of the population of West Helena. Yet, at the time this case was tried, there was only one black alderman in West Helena. Since 1917, there have only been three black aldermen. In 1976, there were two blacks on the council, more than at any time previously or since then. Each of these successful black candidates, however, ran against two whites. When the blacks stood for reelection, each was opposed by one white candidate, and the incumbents were not reelected.
 
 
 60
 Racial bloc voting prevails in West Helena. Almost without exception, black candidates have received more than ninety percent of the vote in the identifiable "black voting areas" and only between fifteen and twenty-four percent of the vote in "white voting areas." With election by wards, blacks could possibly elect representatives from two of the city's wards. At-large voting, however, has made it virtually impossible for the residents of the two "black wards" to elect representatives from their neighborhoods.
 
 
 61
 6. Specific Sequence of Events.
 
 
 62
 In November, 1977, after blacks had instituted a boycott of white businesses and petitioned the council to change to ward elections, the city council voted four-to-three to draft an ordinance that would provide for the election of aldermen by wards. The proposed ordinance was to be presented for consideration at the next council meeting. Thereafter, the city attorney expressed the view that under Arkansas law, a majority of five votes was required to draft such an ordinance. The city council has not voted on the issue again.
 
 
 63
 It is significant that the city attorney did not state his view until after the council had voted to draft a proposal to change to elections by ward. Moreover, the opinion was given despite the fact that L. T. Simes, a black alderman, explicitly stated at the November 29th council meeting that he had been assured by the county clerk that a majority vote was not required to prepare the proposed ordinance. Finally, no copy of a written opinion by the city attorney was introduced into evidence and no authority for the view was cited to this Court or the district court.
 
 
 64
 The timing of the city attorney's opinion and subsequent failure of the council to re-vote on changing to ward election evinces a discriminatory purpose. The specific sequence of events leading up to a decision and departures from the normal procedural process such as occurred here are evidence of a discriminatory purpose. See Arlington Heights v. Metropolitan Housing Corp., supra, 429 U.S. at 266-268, 97 S.Ct. at 564-565.
 
 
 65
 7. Legislative and Administrative History-Direct Evidence.
 
 
 66
 The legislative or administrative history is relevant to the issue of discriminatory intent, especially where, as here, there are contemporary statements of members of the decisionmaking body. Arlington Heights v. Metropolitan Housing Development Corp., supra, 429 U.S. at 268, 97 S.Ct. at 565.
 
 
 67
 Based on testimony at trial, the district court reached a specific legal conclusion that evidence showed that "the City has retained the present system primarily because of a belief that at-large elections best serve the interest of the city as a whole. Ward elections, it is believed, would result in the accentuation of 'local' interests at the expense of the common needs of the general population." We find little support in the record for this conclusion and, therefore, reject it.
 
 
 68
 At trial, Mayor Teeter suggested that at-large voting encouraged aldermen to place citywide interests before the concerns of the wards in which they lived. Yet, not one of the three aldermen opposing the motion to draft a proposed ordinance to change to ward elections at the November 29, 1977, council meeting advanced this theory for retaining at-large elections. Two of the aldermen simply said that the issue should be submitted to a vote of the citizens. In this regard, it should be remembered that sixty percent of the population of the city is white. The third, J. R. Cunningham, flatly stated, "I do not think you would have fair representation as far as white people are concerned with the four wards." Indeed, on this record, the aldermen would have been hardpressed to claim that they opposed a change in election systems because they did not want local concerns to predominate over citywide interests. The evidence shows that the white aldermen, irrespective of their residence, consistently put the interests of the white wards first.
 
 
 69
 The testimony at trial of a white alderman further demonstrates that the city council maintained the at-large election scheme for a discriminatory purpose. Watson Light testified that he opposed election by ward because black voters predominate his ward and they would not elect him to represent them:
 
 
 70
 Q. Do you have any reasons why you want it to remain (at-large elections)?
 
 
 71
 A. Yes, I do.
 
 
 72
 Q. What are your reasons?
 
 
 73
 A. I couldn't be elected if it was changed.
 
 
 74
 Q. Why couldn't you be elected?
 
 
 75
 A. Because there's more black people that live in the ward that I live in than white people. And if the blacks vote as a block, as they normally do, then I could never be elected. I'd be precluding myself from being on the Council. And I couldn't vote that way.
 
 
 76
 Q. Don't whites vote as a block, too?
 
 
 77
 A. Usually, usually.
 
 
 78
 Q. So, by your theory then, that precludes black people from getting elected?
 
 
 79
 A. It could be construed as that.
 
 
 80
 The direct evidence of discriminatory intent contained in the statements of Aldermen Cunningham and Simes convince us that the district court erred in reaching the legal conclusion that the defendants maintained at-large voting to advance citywide interests. Not one single alderman advanced the "citywide" interest rationale for retaining at-large voting at the November 29, 1977, council meeting. Indeed, the only support for the district court's conclusion is the after-the-fact testimony given by Mayor Teeter at trial.[15] This testimony is not sufficient to sustain the district court's conclusion in light of the direct contemporary evidence of discriminatory intent contained in the statements of Alderman Cunningham, which are corroborated by the direct evidence of Alderman Simes at trial. Moreover, the circumstantial evidence also supports the inference that the defendants acted with an invidious intent in retaining West Helena's at-large electoral system.
 
 
 81
 The testimony of two of West Helena's white aldermen does not necessarily "condemn" the city's at-large voting scheme. It is, however, an important fact, in the totality of facts and circumstances, tending to prove that the at-large electoral system was maintained for a discriminatory purpose. McMillan v. Escambia County, Florida, supra, 638 F.2d at 1247-1248. Moreover, this direct evidence of discriminatory intentions of two of West Helena's aldermen distinguishes this case from Bolden. In Bolden, the only direct evidence of invidious intent was contained in the statements of state legislators from Mobile who were not parties to the case. See City of Mobile v. Bolden, supra, 446 U.S. at 72-74 & nn. 21 & 22, 100 S.Ct. at 1503 & nn. 21 & 22 (plurality opinion). In contrast, here the direct evidence of intentional discrimination is contained in the explicit statements of the officials who are directly responsible for maintaining West Helena's at-large voting system and who have rejected requests to change the voting plan to elections by ward.
 
 
 82
 8. Ward Size Disparity.
 
 
 83
 The populations of the wards in West Helena are disparate, even though state law requires that ward size be "substantially equal." Ark.Stat. § 19-1002.7. Seventy-three percent of West Helena's population reside in its two predominantly black wards. Only twenty-seven percent of the city's population live in the two all-white wards. The wards have not been redistricted since they were adopted in 1920 despite population changes. This disparity in ward size, coupled with the requirement that the aldermen reside in the wards from which they are elected, results in disproportionate underrepresentation for the residents of the two "black" wards. Yet, despite the foregoing state statute, repeated Supreme Court decisions emphasizing the importance of the "one person-one vote" principle, e.g., Reynolds v. Sims, supra, 377 U.S. at 533, 84 S.Ct. at 1362, 12 L.Ed.2d 506, and requests by blacks for redistricting, the city council has refused to reapportion West Helena's wards to insure proportionate representation for the citizens of the two "black" wards. This evidence is probative of a finding that West Helena's at-large system is being maintained for a discriminatory purpose.[16]
 
 
 84
 9. Balance of Interests.
 
 
 85
 Finally, we address the district court's conclusions that the "City of West Helena and its citizenry has a substantial interest in maintaining the present system of at-large elections" and that the city retained at-large elections for this neutral reason.
 
 
 86
 In reaching these conclusions, the district court balanced the discriminatory effect of West Helena's at-large voting scheme against the city's interest in maintaining its election system. Such a balancing of the parties' competing interests is an appropriate factor to consider in determining whether an inference of invidious intent can be drawn from the evidence in a vote dilution case. See Note, The Supreme Court, 1979 Term, 94 Harv.L.Rev. 75, 147-148 (1980); Note, Discriminatory Purpose and Disproportionate Impact: An Assessment After Feeney, supra, 79 Colum.L.Rev. at 1407-1412.[17] We cannot agree with the district court that West Helena has maintained its present electoral system for neutral reasons.
 
 
 87
 In the balancing process, we determine the discriminatory impact by considering both the extent to which the harm is shared with those who are not members of the minority group and the importance of the individual interest implicated. Note, The Supreme Court, 1979 Term, supra, 94 Harv.L.Rev. at 147-148. Here, the vote diluting impact of West Helena's at-large system is borne nearly solely by blacks.[18] The individual interest involved is the crucial interest in the right to vote. The Supreme Court has recognized that "each and every citizen has an unalienable right to full and effective participation in the political processes." Reynolds v. Sims, supra, 377 U.S. at 565, 84 S.Ct. at 1383. Moreover, the right to vote is particularly important because it is the cornerstone for upholding other basic political and civil rights. Id. at 561, 84 S.Ct. at 1381. But here, the opportunity of West Helena's black citizens to exercise this right effectively has been significantly limited by the at-large voting plan maintained by the defendants. Id. at 774-775.
 
 
 88
 Against this substantial adverse impact caused by the at-large voting system must be weighed West Helena's interest in retaining its electoral scheme. The at-large voting scheme is optional under Arkansas law. Thus, there is no strong state policy favoring at-large voting in municipal elections. See Lodge v. Buxton, supra, 639 F.2d at 1379. Nonetheless, the defendants assert that they have maintained the at-large scheme to prevent local interests from predominating over citywide concerns on the city council. This interest, as the district court found, is legitimate. See City of Mobile v. Bolden, supra, 446 U.S. at 81, 92-93, 100 S.Ct. at 1507, 1513 (Blackmun and Stevens, JJ., concurring). The direct evidence, however, establishes that the defendants retained at-large elections not to promote citywide interests, but rather to protect the white incumbents on the council. Id. at 779-780.
 
 
 89
 Accordingly, we find that the record does not support the district court's legal conclusion that the evidence is more persuasive that the at-large voting system was maintained for a neutral reason rather than for a discriminatory purpose. The balance between the competing interests of the parties clearly supports an inference that the defendants here acted with discriminatory intent.
 
 
 90
 E. CONCLUSION.
 
 
 91
 The district court found that West Helena's at-large electoral system was neither created nor maintained for a discriminatory purpose. After carefully reviewing the record and briefs, and hearing oral argument, we believe that the district court's finding that the plaintiffs did not prove discriminatory intent is clearly erroneous. On the basis of the direct and circumstantial evidence in this case, we hold that the at-large system in West Helena was unconstitutionally maintained for the discriminatory purpose of limiting the opportunity of blacks to participate meaningfully or effectively in the political process and to elect legislators of their choice.
 
 
 92
 The record here shows that each of the factors relevant to the issue of intent raises the inference that West Helena's at-large voting system was maintained for a discriminatory purpose. Moreover, and of particular importance, there is direct evidence that the at-large electoral system was retained to prevent white aldermen from losing their seats to black candidates. Such direct evidence of invidious intent, so rarely available, must be given great weight in answering the question of whether a defendant acted with a discriminatory purpose. At-large voting plans have been adopted by many municipalities throughout the nation, and they can serve legitimate governmental purposes. But the evidence does not support a finding that the West Helena plan was retained to further such interests.
 
 
 93
 In sum, we conclude that the plaintiffs have established that West Helena's election system violates the Fourteenth and Fifteenth Amendments of the United States Constitution, and section 2 of the Voting Rights Act of 1965. The district court's dismissal of plaintiffs' claims, therefore, is reversed. We remand the case to the district court to fashion appropriate relief for these violations consistent with this opinion.
 
 
 94
 Lastly, we turn to plaintiff's contention that the district court erred in refusing to exercise its pendant jurisdiction to redraw West Helena's ward boundaries. The plaintiffs claim that the present wards are not substantially equal in size as required by Arkansas law. Ark.Stat.Ann. § 19-1002.7. The district court declined to reach the issues presented by the disparity in ward sizes. Rather, it held that plaintiffs must pursue the streamlined redistricting remedy provided by Ark.Stat.Ann. § 19-1005 which is available in a state court proceeding. In light of our disposition of this case, the district court should reconsider this issue on remand.
 
 
 
 *
 The Honorable JOHN K. REGAN, United States Senior District Judge, Eastern District of Missouri, sitting by designation
 
 
 [1]
 Not all of the named plaintiffs in this action are residents of West Helena. Some are residents, however, and they are clearly proper parties here
 
 
 [2]
 Vote dilution occurs when an at-large election plan is used to cancel out the voting strength of a substantial minority population. Typically, a relatively small geographic area of a municipality will be occupied by a minority group which would constitute a majority or near majority of a single election district if an election-by-district voting system was used instead of an at-large scheme. That minority group would then be able to elect representatives of its choice for that district. Under an at-large system, however, where the majority of voters in the municipality is white, the minority group's voting power will be overcome by the citywide strength of white voters. Thus, minorities do not elect any representative notwithstanding the group's geographical concentration. See Nevett v. Sides, 571 F.2d 209, 216 (5th Cir. 1978); Comment, City of Mobile v. Bolden: A Setback in the Fight Against Discrimination, 47 Brooklyn L.Rev. 169, 172 & n.9 (1980)
 
 
 [3]
 Avery v. Midland County, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968), extended the standards of Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), to local governments
 
 
 [4]
 Justice Stewart was joined in the plurality opinion by Chief Justice Burger and Justices Powell and Rehnquist in City of Mobile v. Bolden, 446 U.S. 55, 58, 100 S.Ct. 1490, 1495, 64 L.Ed.2d 47 (1980)
 
 
 [5]
 The plaintiffs also challenge West Helena's at-large voting scheme under Section 2 of the Voting Rights Act, 42 U.S.C. §§ 1971, 1973. Although the exact reach of Section 2 has not yet been resolved, it is clear that the section at least is coterminous with the Fifteenth Amendment. Washington v. Finlay, supra, 664 F.2d at 927; Kirksey v. City of Jackson, 663 F.2d 659, 665 (5th Cir. 1981). Therefore, because we conclude in this case that the defendants engaged in purposeful discrimination in violation of the Fifteenth Amendment, they have also violated Section 2 of the Voting Rights Act. We need not reach plaintiffs' contention that a showing of discriminatory impact alone is sufficient to establish a Section 2 violation
 
 
 [6]
 While Justices Brennan and Blackmun did not expressly state their views on the issue, we gather from the opinions as a whole that they agreed with Justices Stevens, White and Marshall that a vote dilution claim is a proper Fifteenth Amendment cause of action. Moreover, we are convinced that the Fifteenth Amendment is not so narrowly circumscribed as to protect only against direct official barriers that prevent blacks from registering and voting. Mere access to the ballot does not insure that minorities will be accorded the opportunity to participate effectively in the political process. Note, The Supreme Court, 1979 Term, 94 Harv.L.Rev. 77, 144 (1980). When an at-large electoral system dilutes the voting strength of a minority group, the minority voters are denied a fair opportunity to influence the choice of representatives. Id. at 144. The right to vote then becomes a futile and meaningless exercise. E.g., City of Mobile v. Bolden, supra, 446 U.S. at 84-86, 126-129, 100 S.Ct. at 1509-10, 1532-34 (Stevens, J., concurring in judgment; Marshall, J., dissenting); Note, The Supreme Court, 1979 Term, supra, 94 Harv.L.Rev. at 144. The Supreme Court has repeatedly found that the Fifteenth Amendment guarantees not only the right to register and vote, but also the right to participate effectively and meaningfully in the electoral process. See, e.g., White v. Regester, 415 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971); and cases cited in note 7, infra. Also see Note, Voter Dilution and New Intent Requirements Under the Fifteenth and Fourteenth Amendments, 18 Hous.L.Rev. 611, 614 & n.29 (1981)
 
 
 [7]
 Arkansas passed an Election Code in 1891 to begin the process of disenfranchising blacks. In 1895, the legislature established a poll tax. In 1906, the Democratic Party adopted a "white primary." Blacks were not permitted to vote in the Democratic Party primary until Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944), and the poll tax remained in effect until the passage of the Voting Rights Act in 1965. From 1965 until the date of trial, despite changes in the law, impediments were still placed in the path of blacks wishing to register, and it was often difficult for them to vote because the black polling places were often inconvenient and overcrowded. The case was not tried below, however, on the theory that these impediments standing alone were sufficient to constitute a violation of the Fifteenth Amendment and we will not decide it on that theory here. We note, however, that the Supreme Court has interpreted the Fifteenth Amendment as providing protection to the entire electoral franchise, and not just the official right to register and vote. See, e.g., Wright v. Rockefeller, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964); Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960); Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); United States v. Saylor, 322 U.S. 385, 64 S.Ct. 1101, 88 L.Ed. 1341 (1944); Smith v. Allwright, supra. Also see Note, City of Mobile v. Bolden: Voter Dilution and New Intent Requirements Under the Fifteenth and Fourteenth Amendments, supra, 18 Hous.L.Rev. at 614 & n.29. Moreover, we will consider these impediments as probative of the question of whether the at-large voting scheme was maintained for a discriminatory purpose in analyzing plaintiffs' vote dilution theory
 
 
 [8]
 We need not reach the question of whether a Fifteenth Amendment vote dilution cause of action may also be established by a showing of discriminatory impact alone because of our conclusion that the plaintiffs proved intentional discrimination in this case. We note, however, that only the four justices in the Bolden plurality clearly concluded the discriminatory intent was a requirement for a Fifteenth Amendment cause of action. Justices Marshall and Brennan stated in Bolden that a showing of discriminatory impact alone is sufficient to establish a Fifteenth Amendment violation. Justices White and Blackmun did not expressly indicate whether they believed that proof of discriminatory purpose was necessary for a Fifteenth Amendment violation. Justice Stevens, relying on his objective standard, concluded that intent was not a relevant inquiry in vote dilution cases. Prior Supreme Court decisions in other voting contexts do not establish whether a showing of discriminatory purpose is a prerequisite to a Fifteenth Amendment cause of action. See note 7, supra. Also see City of Mobile v. Bolden, supra, 446 U.S. at 126-135, 100 S.Ct. at 1532-36 (Marshall, J., dissenting). Thus, we believe that the question of whether discriminatory intent must be shown to establish a Fifteenth Amendment vote dilution claim is an open one. But see, e.g., Lodge v. Buxton, 639 F.2d 1358 (5th Cir. 1981); Washington v. Finlay, supra, 664 F.2d at 919 (concluding that discriminatory intent is a necessary element of a Fifteenth Amendment claim)
 
 
 [9]
 Indeed, it is obvious that requiring a plaintiff to produce direct evidence would often be an insurmountable burden because public officials rarely, if ever, leave behind a well-documented record of their illicit motives. Lodge v. Buxton, supra, 639 F.2d at 1373; Note, Discriminatory Purposes and Discriminatory Impact: An Assessment After Feeney, 79 Colum.L.Rev. 1376, 1404 (1979)
 
 
 [10]
 The Fifth Circuit in Bolden relied on the test it developed in Zimmer v. McKeither, 485 F.2d 1297 (5th Cir. 1973) (en banc), aff'd on other grounds, 424 U.S. 63, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1975), to find that Mobile's at-large election system was unconstitutional. In Zimmer, the Fifth Circuit held that a multi-member electoral system was unconstitutional because it was maintained to dilute the voting strength of minority voters. The Court identified a list of factors that should be considered in evaluating a vote dilution claim. It said:
 where a minority can demonstrate a lack of access to the process of slating candidates, the unresponsiveness of legislators to their particular interests, a tenuous state policy underlying the preference for multi-member or at-large districting, or that the existence of past discrimination in general precludes the effective participation in the election system, a strong case is made. Such proof is enhanced by a showing of the existence of large districts, majority vote requirements, anti-single shot voting provisions and the lack of provisions for at-large candidates running from particular geographical subdistricts. The fact of dilution is established upon proof of the existence of an aggregate of these factors. The Supreme Court's recent pronouncement in White v. Regester, supra, demonstrates, however, that all these factors need not be proved in order to obtain relief.
 Id. at 1305.
 
 
 [11]
 We conclude that because Justice Stevens' test for unconstitutional dilution is so substantially different than that employed by the other justices, his view must simply be counted as uncertain when determining what is the proper standard for finding discriminatory intent. Accord, Washington v. Finlay, supra, 664 F.2d at 919 n.4
 
 
 [12]
 The defendants argue that the city recently has made significant expenditures for capital improvements in the black residential areas. While there is some evidence that this contention is true, we note that the district court observed that:
 (a)lthough no specific figures are available from the evidence, the Court has the impression that a substantial portion of the expenditures for capital improvements in the black residential areas has been money from federal grant funds. The City has not qualified for some grant funds because it did not have an affirmative action plan which met the standards required by H.U.D. An affirmative action plan for the city was not adopted until June, 1980. (Footnote omitted.)
 An expenditure of federal grants targeted for a specific purpose is hardly sufficient to refute plaintiffs' evidence that West Helena's municipal government has neglected the needs of the blacks.
 
 
 [13]
 The defendants argue that because West Helena adopted its at-large system in 1920, when blacks were totally disenfranchised, the city could have no racial motivation in selecting or retaining its voting scheme. For the reasons set forth in the text, we conclude that West Helena's adoption of its at-large voting plan during a time the state was enacting a series of laws to disenfranchise blacks is probative of a finding that the electoral system has been maintained for a discriminatory purpose. However, we agree with the district court that the plaintiffs have failed to prove that the at-large voting scheme was adopted for a discriminatory purpose
 
 
 [14]
 Justice Marshall described single-shot voting and its effect in City of Rome v. United States, 446 U.S. 156, 184 n.19, 100 S.Ct. 1548, 1566 n.19, 64 L.Ed.2d 119 (1980):
 Consider (a) town of 600 whites and 400 blacks with an at-large election to choose four council members. Each voter is able to cast four votes. Suppose there are eight white candidates, with the votes of the whites split among them approximately equally, and one black candidate, with all the blacks voting for him and no one else. The result is that each white candidate receives about 300 votes and the black candidate receives 400 votes. The black has probably won a seat. This technique is called single-shot voting. Single-shot voting enables a minority group to win some at-large seats if it concentrates its vote behind a limited number of candidates and if the vote of the majority is divided among a number of candidates." U. S. Commission on Civil Rights, The Voting Rights Act: Ten Years After, pp. 206-207 (1975).
 
 
 [15]
 The district court, citing the minutes of the November 29, 1977, council meeting, found that then Mayor Jessie Porter also opposed the resolution regarding elections by ward because they would tend to promote local concerns at the expense of citywide interests. The minutes of that meeting do not support the district court's finding
 
 
 [16]
 The district court stated:
 it is questionable that reapportionment cases, such as Baker v. Carr, 369 U.S. 186 (82 S.Ct. 691, 7 L.Ed.2d 663) (1962), would condemn the unequal wards in West Helena since all aldermen are elected city-wide. A vote in one ward has as much weight in a city-wide election as does a vote in any other ward.
 We do not agree that a vote in one ward has as much weight as a vote in any other ward. While the representation problems here are not as clear-cut as in the classic reapportionment cases, the "one man, one vote" principle, e.g., Reynolds v. Sims, supra, 377 U.S. at 533, 84 S.Ct. at 1362, 12 L.Ed.2d 506, still has implications for at-large systems such as the one used by West Helena. To the extent that the councilmen from any particular ward act to protect and promote the interests of the citizens of their ward, residents of the larger wards have less proportional representation than voters in the less populated wards. And the fact that West Helena's at-large system has candidates run from wards and requires that the councilmen be residents of the wards that they represent, creates a strong likelihood that the councilmen will have some sense that they are representing the interests of their ward-not just the city as a whole-even though they are elected by the entire electorate.
 
 
 [17]
 The Supreme Court's recent decisions in Personnel Administrator v. Feeney, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979); Columbus Board of Education v. Penick, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979); and Dayton Board of Education v. Brinkman, 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979), suggest that in determining whether or not a discriminatory intent can be inferred from circumstantial evidence, an important consideration is the balance between the governmental interest advanced in favor of the challenged action and the discriminatory impact caused by the action. A recent analysis of the Supreme Court's standards for determining discriminatory purpose in light of these cases commented:
 The realistic and practical application of the discriminatory purpose requirement necessitates that courts, in weighing objective evidence, engage in a balancing process designed to determine the plausibility that a disputed policy was adopted without the contamination of suspect considerations. In particular, courts should be willing to weigh the extent and severity of the disproportionate effects of a challenged policy against the importance of its "legitimate" purposes to the legislators or administrators involved, to determine the plausibility that the legislators or administrators relied solely on "neutral" considerations in adopting the challenged policy.
 Note, Discriminatory Purpose and Disproportionate Impact: An Assessment After Feeney, supra, 79 Colum.L.Rev. at 1408 (emphasis included).
 The commentators in Note, The Supreme Court, 1979 Term, supra, 94 Harv.L.Rev. at 147-148, concluded that this same balancing process should be used in determining whether or not discriminatory intent can be inferred in a vote dilution case.
 
 
 [18]
 To the extent that the harm here consists of underrepresentation caused by the disparity in ward sizes, the white residents of the city's two large wards are effected as well as black voters. These two large wards, however, have predominately black voters